NICHOLAS VOEVODINE, Respondent, *v.* GOVERNMENT OF THE COM-MANDER-IN-CHIEF OF THE ARMED FORCES IN THE SOUTH OF RUSSIA, Defendant, Impleaded with PETER A. MOROSOFF, Appellant.

First Department, May 1, 1931.

*Mahlon B. Doing* of counsel [*Frederic R. Coudert, Jr.*, with him on the brief; *Coudert Brothers*, attorneys], for the appellant.

*Borris M. Komar*, for the respondent.

SHERMAN, J. This appeal questions the sufficiency of the complaint as stating a cause of action against appellant Morosoff. Assuming the allegations of the complaint to be true, the following facts appear, viz.:

Plaintiff, a resident and citizen of New York, had dealings with a military unit known as the Don Corps, which was part of the armed forces of a government termed in the summons " Government of the Commander-In-Chief of the Armed Forces in the South of Russia." That government was known and is referred to in the briefs as the Denikin government. Plaintiff in May, 1920, sold and delivered to the Denikin government and to the Don Corps quantities of horses, cattle and sheep and received memoranda thereof under the signature and seal of that government and the said Don Corps, but he has not been paid the agreed and reasonable price of this property. The Denikin government in 1920 was a *de facto* government, which existed for a short time in the southern part of European Russia and was not recognized by the government of the United States as either a *de facto* or a *de jure* government. The Russian Trade Committee is an unincorporated body consisting of more than seven persons, having its principal place of business in New York city, of which appellant Morosoff was and still is president. That committee was formed for the purpose of pecuniary profit to be derived from the business of exporting and importing merchandise from and to the United States, on its own account and for account of the Denikin government and of private persons. During the times mentioned in the complaint the Denikin government had, and still has, moneys, securities and other assets within this State, although that government ceased to exist in or about the year 1920. Appellant Morosoff, individually and as such president, has in his possession these assets belonging to the Denikin government, which he has retained despite the termination of his authority to represent that government, and which he is using for

his personal purposes, and there is danger that these funds will be dissipated and lost. The assets now held by him were derived from the sale of merchandise sent to this country by the Denikin government in the course of its commercial transactions and sold for its account. It has no property in this State, except such as is held by Morosoff.

The pleading further states that the Denikin government does not come within the jurisdiction of the courts of the United States; that the plaintiff has no remedy unless the court appoint a receiver of this property so held by Morosoff and enjoin the transfer and distribution of those assets. The relief demanded is that a receiver be appointed of all the property above mentioned; that Morosoff be held accountable for the assets of that government to the receiver and to creditors, and that the receiver so appointed shall keep the property until a successor government be recognized by the United States.

The Denikin government (which has not been served and does not appear in this action) existed for a very brief time until its troops were defeated by the armed forces of the Soviet Republic, which overran its territory and established such government as now exists in that area. Assuming, as stated in the complaint, that the Denikin government was actually a *de facto* government, its existence has long since terminated.

During its life no enforcible right or remedy in the courts of this country existed against that *de facto* government, for it could not be required to submit itself to our laws and to the jurisdiction of our courts. This is true, irrespective of whether or not such government were recognized by the government of the United States. Questions arising out of the claim of any citizen of this country against that government are to be redressed through diplomatic channels (if it were a recognized government) or by direct application to that government, but not through our courts. " The question is a political one, not confided to the courts but to another department of government." (*Wulfsohn* v. *Russian Republic*, 234 N. Y. 372.)

In *Nankivel* v. *Omsk All Russian Government* (237 N. Y. 150), where the defendant government had a brief span of life, it was held that so long as it maintained an independent existence, it was immune from suit for its governmental acts in our courts without its consent, and when extinguished by conquest it became, so far as its continued corporate existence is concerned, as if it had never existed. A mere contract claimant against such a government could not bring the government as owner of the property mentioned in the complaint into court here to answer to the debt.

Therefore, if the Denikin government had survived, plaintiff could not have recovered a judgment against it. Its extinction does not give him any superior right.

Plaintiff, moreover, has only what may be termed the moral obligation of that government to requite his demand. Finding property here which belongs to that government gives him no enforcible legal right to require it to be applied to the payment of his claim. In *Twycross* v. *Dreyfus* ([1877] 5 Ch. 605) plaintiff was the holder of Peruvian bonds issued by that republic through the defendants who were its agents at London. After default in payment of interest, suit was filed, it being claimed that the individual defendants who appeared sold guano for that government, the proceeds of such sales belonging to it; that the guano was part of that mentioned in the prospectus and bonds as being part of the security to the bondholders for the payment of principal and interest. The Republic of Peru, though invited to join the action as defendant, did not appear. The question determined was whether or not the creditor of that government had the right to have this property applied to the payment of the debt. The court, after holding that the agreement between the Peruvian government and its bondholders created no lien or charge upon any property of the government, determined that plaintiffs, being ordinary creditors, could not recover. JESSEL, M. R., stated (p. 616): " The first and most important point we have to decide is what the meaning of the bond of a foreign government given to secure the payment of a loan is. As I understand the law, the municipal law of this country does not enable the tribunals of this country to exercise any jurisdiction over foreign governments as such. Nor, so far as I am aware, is there any international tribunal which exercises any such jurisdiction. The result, therefore, is that these so-called bonds amount to nothing more than engagements of honour, binding, so far as engagements of honour can bind, the government which issues them, but are not contracts enforceable before the ordinary tribunals of any foreign government, or even by the ordinary tribunals of the country which issued them, without the consent of the government of that country. That being so, it appears to me that the bond in question confers no right of action on the Plaintiff, and on that ground it seems to me it follows that the demurrer ought to be allowed."

Plaintiff further argues that, with the demise of the Denikin government, the agency of Morosoff terminated and the property held by him must be applied to satisfy the claims of creditors just as if that government were a corporation which had been dissolved. His citations relate largely to judgment creditors' actions or suits

against the successor of a dissolved corporation or holders of its property. The analogy is inapt and misleading, for a private corporation differs so essentially from a government that the remedies of creditors are in no wise alike. (*Nankivel* v. *Omsk All Russian Government, supra*, 157.) Against the one, the creditor has only a moral unenforcible claim, while against the other he may maintain his action to judgment. He may thus become a judgment creditor of the one, but not of the other. This suit cannot be treated as a judgment creditor's action because plaintiff is not now and could never become a judgment creditor. The essential basis of such equitable procedure, viz., the possession of or right to judgment against the debtor, is absent. In the *Nankivel* case the default judgment against the Omsk All Russian government was held void when plaintiff attempted to enforce its collection through proceedings supplementary to execution (a statutory procedure akin in many respects to a judgment creditor's action). The court permitted a third party to raise that question, ruling that upon the overthrow of the government it utterly perished and retained no property against which the claim could be enforced.

The property of such a government belongs to the State, as sovereign, and upon the overthrow of the *de facto* government another government replacing it would succeed to the representative right of such *de facto* government in al of its property. Here, if plaintiff had dealt with Morosoff as the agent of the government in a purely commercial transaction, or had acquired a lien upon the property in his possession, a different question would be presented. The right of succession may be made subject to all charges or liens arising. (*United States of America* v. *Prioleau*, [1865] 2 H. & M. 559; 71 Eng. Rep. Vice-Chancellor's Court, 580.)

In *United States of America* v. *McRae* ([1869] L. R. 8 Eq. 69) the United States sued for property held in England by the agent of the late Confederate government, and it was held that as successor of the *de facto* Confederate government, it had a right to the property of that displaced government, the court holding (p. 75): " I apprehend it to be the clear public universal law that any government which *de facto* succeeds to any other government, whether by revolution or restoration, conquest or reconquest, succeeds to all the public property, to everything in the nature of public property, and to all rights in respect of the public property of the displaced power, whatever may be the nature or origin of the title of such displaced power. Any such public money in any treasury, any such public property found in any warehouses, forts, or arsenals, would, on the success of the new or restored power, vest *ipso facto* in such power; and it would have the right to call

to account any fiscal or other agent, or any debtor or accountant to or of the persons who had exercised and had ceased to exercise the authority of a government, the agent, debtor, or accountant having been the agent, debtor, or accountant of such persons in their character or pretended character of a government. But this right is the right of succession, is the right of representation, is a right not paramount, but derived, I will not say under, but through, the suppressed and displaced authority, and can only be enforced in the same way, and to the same extent, and subject to the same correlative obligations and rights as if that authority had not been suppressed and displaced and was itself seeking to enforce it."

A like conclusion was reached in *United States of America* v. *Prioleau* (35 L. J. Ch. [1866] [ N. S.] 7). In *The Sapphire* (78 U. S. [11 Wall.] 164) the court differentiated between ownership of a French transport by Emperor Napoleon III as an individual and as sovereign of France, declaring (p. 168): " The next question is whether the suit has become abated by the recent deposition of the Emperor Napoleon. We think it has not. * * * The reigning Emperor, or National Assembly, or other actual person or party in power is but the agent and representative of the national sovereignty. A change in such representative works no change in the national sovereignty or its rights. The next successor recognized by our government is competent to carry on a suit already commenced and receive the fruits of it."

As stated in *Lehigh Valley Railway Co.* v. *State of Russia* (21 F. [2d] 396, 401): " The suit did not abate by the change in the form of government in Russia; the State is perpetual and survives the form of its government."

In conclusion, we hold that so long as the Denikin government lasted, plaintiff could not have enforced any claim as against its property held by Morosoff, and when that government fell, its property did not become a trust fund for creditors to be distributed by the courts of this State, but remained rather to be taken over by a successor government whenever claims thereto may be presented through actions in our courts by such government after it shall have been previously recognized by the government of the United States. (*Russian Republic* v. *Cibrario*, 235 N. Y. 255.)

The relief sought by plaintiff, if granted, would require the appointment of a receiver to hold this property until such time as a government shall have acquired sovereignty over the area formerly held governmentally by the Denikin government, and shall have been recognized by the government of the United States. That hour may be far distant; it may not happen for years or centuries; meanwhile this court would be engaged in holding and

protecting this property. The court should not enter that field. To do so would be to invite similar actions with respect to the property of any government, whether recognized or unrecognized, whether *de facto* or *de jure*, whose property might happen for the time being to be within the confines of this State.

The complaint is, for the foregoing reasons, held insufficient. The order appealed from should be reversed, with ten dollars costs and disbursements, and the motion granted, with ten dollars costs to appellant.

FINCH, P. J., MERRELL, O'MALLEY and TOWNLEY, JJ., concur.

Order reversed, with ten dollars costs and disbursements, and motion granted, with ten dollars costs.